HARMAN GROUP CORPORATE FINANCE, INC., Appellant,

v.

ACADEMY OF MEDICINE OF COLUMBUS AND FRANKLIN COUNTY, Appellee.

[Cite as *Harman Group Corporate Finance, Inc. v. Academy of Medicine of Columbus & Franklin Cty.* (1994), 94 Ohio App.3d 712.]

Court of Appeals of Ohio,
Franklin County.

No. 93APE09-1354.

Decided May 3, 1994.

714

*Harris, Carter & Mahota* and *John M. Mahota; Buckley, King & Bluso* and *Gary A. Gillett,* for appellant.

*Greenwald & Associates, Douglas J. Hart, Donell R. Grubbs* and *Gary D. Greenwald,* for appellee.

TYACK, Judge.

On October 31, 1991, The Harman Group Corporate Finance, Inc. ("Harman Group") filed a complaint in the Franklin County Court of Common Pleas against Academy of Medicine of Columbus and Franklin County ("Academy"), alleging breach of contract. The suit arose out of events surrounding the possible sale of the Academy's shares of stock in Physicians Health Plan Corporation ("PHP") and the eventual merger of PHP into United Health Care Corporation ("United Health Care").

The Academy, a nonprofit agency, formed PHP in 1978 as a nonprofit corporation to operate as a preferred provider organization. In September 1985, the Academy and PHP entered into a Guaranty of Value and Stock Restriction Agreement with the Ohio Attorney General pursuant to the decision to make PHP a for-profit corporation. Five hundred thousand shares of PHP stock were issued, 333,333 to the Academy and 166,667 to PHP at $10 per share. Subsequently, a two-for-one split left the Academy with a total of 1 million shares valued at $5 per share. PHP was given the option to repurchase shares held by the Academy at a maximum rate of one purchase per year of no less than one-fifth of the shares of the Academy. PHP tendered such an offer to the Academy in 1989, and the resulting sale of 200,000 shares of stock left the Academy with 800,000 shares out of a total of 1.5 million shares of PHP stock. The Academy remained the controlling shareholder with approximately fifty-three percent of the stock.

PHP tendered another offer in 1990. Due to certain events, including private purchases of PHP stock from PHP, however, the Academy believed its stock was worth more than PHP was paying or offering to pay, and the Academy rejected

the offer. Howard Zitsman, president of Harman Group, read about the activity in PHP stock and believed a sale of PHP was possible. Zitsman eventually met with the Academy's attorneys and offered his services. Discussions with these attorneys led to an initial engagement letter which called for the Harman Group to perform a valuation of the Academy's interest in PHP for a fee of $35,000. Additional second-phase services were offered if the Academy chose the Harmon Group at a later time. The engagement letter was signed by Dr. Ronald Kendrick, president of the Academy, and by Zitsman on March 20, 1991.

During this period, PHP had informed the Academy that it was pursuing the possibility of an Initial Public Offering ("IPO"). The Academy, realizing that an IPO would result in its losing its majority shareholder status, favored a block sale of all its stock so that it could have the benefit of the control premium. The form such a block sale would take, however, had not been decided.

The Harman Group completed the valuation and submitted it to the Academy on April 8, 1991. Full payment was made pursuant to the engagement letter. At an April 12, 1991 meeting, which Zitsman attended in order to answer questions regarding his valuation, the Academy voted to sell its block of PHP stock. The parties disagree as to any subsequent discussion regarding the Harman Group performing certain second-phase services for the Academy. The Academy states that it did not know what services, if any, for which it might engage the Harman Group because it did not know how PHP would react to the Academy's vote to sell all of its stock. The Academy also presented testimony that no one engaged or authorized Harman Group to perform additional services for the Academy. The Harman Group contends it began performing second-phase services for the Academy after the April 12 vote.

On April 15, 1991, PHP voted to undertake the private sale of all PHP stock and to retain an investment banker to carry this out. PHP began interviewing investment bankers and Zitsman attended these interviews. On April 19, 1991, Zitsman submitted a second engagement letter to the Academy's attorneys, proposing that the Harman Group perform second-phase services such as advising and assisting, and acting as the Academy's exclusive agent in the divestiture of the Academy's equity interest in PHP. The fee for such services was listed as one percent of the gross proceeds from the sale of the Academy's shares.

The second engagement letter was never signed and on April 25, 1991, the Academy approved and PHP voted to retain the investment banking firm of Donaldson, Lufkin, and Jenrette ("DLJ") to conduct the sale of *all* PHP shares. The Harman Group was informed that the Academy would not require its services. However, pursuant to a request by Zitsman, he was permitted to attend a May 8, 1991 meeting of the Academy's executive committee, during which he attempted to persuade the Academy to allow him to perform second-

phase services. The Academy informed Zitsman at that meeting that the Harman Group services would not be required. However, the executive committee did vote to give the Harman Group payment for services rendered between April 5 and May 8, 1991. Subsequently, PHP merged into United Health Care Corporation.

In its lawsuit, the Harman Group originally sought recovery under both a breach of contract theory and quantum meruit. Subsequently, the Harman Group dismissed its quantum meruit claim. Both parties filed motions for summary judgment, which were denied. A jury trial was held and on September 1, 1993, a judgment entry was filed reflecting the jury verdict in favor of the Academy (hereinafter "appellee"). The Harman Group (hereinafter "appellant") has appealed to this court, assigning seven errors for our consideration:

"I. The trial court erred in denying the motion of plaintiff The Harman Group Corporate Finance, Inc. for partial summary judgment as to the third defense of appellee's amended answer (subsequently the second defense of the second amended answer).

"II. The trial court erred in denying the motion in limine of plaintiff The Harman Group Corporate Finance, Inc., and in admitting evidence concerning and relating to the fact that neither appellant The Harman Group nor its principal was licensed by the Ohio Department of Commerce, Division of Securities, as a dealer in securities, or registered with the United States Securities & Exchange Commission as a securities broker-dealer.

"III. The trial court erred by giving an instruction to the jury setting forth Ohio and federal law on securities with respect to the Academy's second defense.

"IV. The trial court erred in admitting evidence as to the value of the services which appellant The Harman Group alleges it already performed under the contract for second phase services, and the value of the services which The Harman Group would have been required to perform under said contract had the academy not instructed appellant The Harman Group to stop performing services.

"V. The trial court erred in refusing to admit into evidence testimony and exhibits offered on behalf of appellant The Harman Group that actions taken by appellant The Harman Group led to a competing bid being presented by QualMed, which resulted in an increase in the ultimate sale price of PHP, and significantly increased the gain of appellee the Academy as a shareholder of PHP.

"VI. The trial court erred in denying a motion by appellant The Harman Group for a mistrial after the Academy revealed a settlement proposal during opening statement.

"VII. The trial court erred in the jury instructions it issued as to the law of contracts in Ohio."

In its first assignment of error, appellant contends that the trial court erred in failing to grant its motion for partial summary judgment relating to one of appellee's defenses. In its second amended answer, appellee raised as a defense that if there was a contract, appellee's performance thereunder was excused and the contract was unenforceable because appellant and its president, Zitsman, were not licensed as dealers in securities by the Ohio Department of Commerce, Division of Securities, or registered as securities brokers pursuant to the Securities Act of 1934. Appellant, in its motion, sought to have this defense dismissed, contending that neither it nor Zitsman was required to be so licensed and registered, that the facts were undisputed, and that it was entitled to judgment as a matter of law. Appellee, in its memorandum in opposition, agreed that the issue for the court to decide was whether as a matter of law appellant was required to be licensed and registered. In its decision on the matter, the trial court held that genuine issues of fact remained and denied the motion. We agree.

Civ.R. 56(C) states the following:

"Summary judgment shall be rendered forthwith if the pleading[s], depositions, answers to interrogatories, written admissions, affidavits, transcripts * * * and written stipulations of fact, if any, * * * show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence * * * construed most strongly in his favor. * * * "

At times, both appellant and appellee seem to contend that the only facts relevant to the issue at hand consist of the provisions in the first and second engagement letters. Appellant, however, contends that the letter essentially memorializes an agreement already made. Appellee contends no agreement was ever reached. Appellee supports its contention with an argument that the services to be performed under the engagement letters required appellant to be licensed and registered as a dealer/broker. The relevant provision in the first engagement letter is paragraph eleven, which states:

"The Academy's legal counsel has suggested that this letter include a brief discussion of advisory services to ensure that The Academy has ongoing financial advice and representation. The Harman Group is prepared to advise, assist in the negotiations, and represent The Academy in the event of a MBO, IPO, or

Block Sale. The Harman Group will assist The Academy and its counsel in achieving the highest value for The Academy's Shares. The Harman Group will provide these services for a fee equal to 1% of the consideration received by The Academy for Shares sold in such a transaction. A separate engagement letter will be provided if The Academy requests the ongoing financial advice and assistance of The Harman Group."

It is undisputed that the first engagement letter was a valid agreement, which was signed by the parties and under which appellant fully performed its services and was duly paid its fee by appellee. However, by its very language, paragraph eleven did not impose a binding duty upon appellant to perform such services and, likewise, did not obligate appellee to pay for such services. The provisions were only a *future* promise to perform *if* such second-phase services were requested by appellee *and* a second engagement letter was provided. Such an engagement letter was submitted to appellee by appellant; however, it was never signed, and the parties now dispute whether a contract for second phase services existed.

The provisions of the engagement letters are helpful in determining whether appellant promised to perform services that would have required it to be licensed and registered. However, they do not constitute the sole facts upon which the trial court could rely to determine whether appellee's defense should be dismissed. Appellant claims that although the second engagement letter was never signed, appellee's attorneys directed it to perform certain second-phase services and that therefore a contract in fact existed and appellant substantially performed under it. The attorneys denied requesting appellant to perform services or attend meetings, contending that appellant acted as a volunteer. Questions of fact, therefore, remained as to what those alleged services were. In addition, because there was no written contract and because there was a dispute as to the existence of the alleged oral engagement, questions of fact remained as to what services the parties contemplated, if any. Because the question of whether appellant was required to be licensed or registered turns on the services actually performed or contemplated to be performed, genuine issues of fact beyond the provisions in the first and second engagement letters existed. Therefore, the trial court did not err in denying appellant's motion for partial summary judgment, and the first assignment of error is overruled.

■ In its second assignment of error, appellant contends that the trial court erred in not granting its motion *in limine*. In its motion, appellant sought to preclude testimony regarding the fact that it was not licensed or registered as a dealer/broker. Appellant contends that such evidence would have had no relevance at trial because, as to the issue of whether appellant had to be licensed or registered, there were no questions of fact or mixed questions of fact and law for

the jury. We note, of course, that we found differently under the first assignment of error. Appellant also contends that to allow the Academy's attorneys to testify that they would not have retained appellant if they had known appellant was not licensed/registered would amount to improper expert testimony.

The granting or denying of a motion *in limine* rests within the sound discretion of the trial judge. See *Riverside Methodist Hosp. Assn. v. Guthrie* (1982), 3 Ohio App.3d 308, 310, 3 OBR 355, 357, 444 N.E.2d 1358, 1361. We find no error and no abuse of discretion here. The evidence at issue in the motion was highly relevant to the question of whether a contract was formed and whether the parties contemplated the services of a broker/dealer. In addition, the Academy's attorneys certainly could testify as to their perception of what appellant could and could not do without being licensed or registered and whether this affected appellee's decision not to retain appellant for second-phase services. Appellant's second assignment of error is overruled.

Assignments of error three and seven are interrelated and will, therefore, be addressed together. In these assignments of error, appellant contends that various jury instructions were erroneous, incomplete, misleading and/or prejudicial. When considering the appropriateness of a jury instruction, the instructions as a whole are reviewed, and no reversible error occurs if the instructions were sufficiently clear and enabled the jury to understand the law as it applied to the facts of the case. See *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 210, 24 O.O.3d 316, 318, 436 N.E.2d 1001, 1003; *Stonerock v. Miller Bros. Paving, Inc.* (1991), 72 Ohio App.3d 123, 134, 594 N.E.2d 94, 102.

Appellant first contends that the court's instruction on one of the definitions of "broker" was erroneous. The court gave the definitions of "broker" set forth in R.C. 1707.01(X) and Section 78c(a)(4), Title 15, U.S.Code and also gave a definition which was set forth in *Legros v. Tarr* (1989), 44 Ohio St.3d 1, 5, 540 N.E.2d 257, 262. The court's instruction stemming from *Legros* was as follows:

"A broker has also been defined by the Supreme Court of Ohio as one who not only introduces parties to a transaction, but also negotiates on behalf of one of the parties keeping that party's best interest in mind."

Appellant contends that this was improper because it was not in effect at the time at issue here and that the statutory definition was the only appropriate definition. *Legros* was decided in 1989, the same time Ohio's statutory definition as explained by the trial court was in effect. Although the statute, R.C. 1707.01(X),[1] is not cited in *Legros*, the case did involve an investment banker and

1. "Broker" is defined in R.C. 1707.01(X) as follows:

the acquisition of a corporation. The Supreme Court of Ohio's definition is consistent with the statutory definition. Therefore, the instruction was proper and within the discretion of the trial court. In addition, it was not error for the trial court not to define the word "effect" as used in R.C. 1707.01(X). The statute does not define "effect" and, therefore, the jury could give it its plain and ordinary meaning.

■   Appellant also contends that reversible error occurred because the trial court failed to instruct on the various exceptions to and exemptions from the licensing requirement. It is clear that appellee was claiming that appellant was acting as a broker and not as a dealer. Therefore, the exemption at issue here would be that contained in R.C. 1707.01(X)(3), one of the exemptions appellant has relied on in its various arguments against having to be licensed.[2] Omitting this exemption from the jury instructions was not reversible error. The instructions as a whole clearly and fairly expressed the pertinent law to the jury. In addition, the R.C. 1707.01(X)(3) exemption involved a question of law, since the facts were undisputed that appellee's portion of the total shares of PHP stock was approximately fifty-three percent. We find no prejudice because the jury could well have found for appellee because it found no contract to exist, as opposed to finding a contract did exist but that appellant was not properly licensed.

■   Appellant next finds error in the various instructions regarding contract law. Again, we find the instructions, as a whole, clearly and fairly expressed the pertinent law to the jury. First, appellant contends the trial court erred in instructing the jury that appellant had to prove appellee breached the contract by failing to fully pay for services performed and that this caused damages, and that appellant suffered actual damages due to appellee's failure to perform. Contrary to appellant's argument, this was not improper as damages was certainly an issue. Appellant claims that it was undisputed that if appellee breached a contract, appellant was owed a one-percent fee as set forth in the first and second engagement letters. However, appellee itself argues that, as there was no written contract, the contract was one implied in fact, under which appellant substantially performed its duties. This gives rise to questions of fact regarding

---

" 'Broker' means any person who effects purchases or sales of securities for the account of others, in the reasonable expectation of receiving a commission, fee, or any other remuneration as a result of such activity."

2. R.C. 1707.01(X)(3) states:
   " 'Broker' * * * does not mean any of the following:
   " * * *
   "(3) Any person engaging in a transaction in which more than eighty per cent of the equity interest in any business enterprise is sold in that transaction."

the amount of services actually performed by appellant, if any. Therefore, damages could have been something other than the one-percent fee.

■ Appellant contends that it was error for the court to instruct that appellee's alleged promise to pay a one-percent fee had to be supported by consideration. Appellant contends that because appellee never raised this as a defense, appellee waived the issue.

Want of consideration is not ordinarily an affirmative defense. To prove a contract, there must be evidence that the contract was supported by consideration. Appellant's reliance upon Civ.R. 8(C) is misplaced, since it makes want of consideration an affirmative defense only with respect to negotiable instruments. Here, a contract, not a negotiable instrument, is alleged. Unless appellant proved consideration, no promise made by appellee would give rise to a contractual relationship. Here, however, mutual promises were claimed and, if proved, could have constituted the requisite consideration. Reading the instructions as a whole, we find no reversible error. The instruction on consideration consisted merely of the statement that the contract had to be supported by consideration and was only included in a list of what was required to form a contract. Although the court elaborated on other requirements in this list, it said nothing further regarding consideration and did not define it. We find no prejudicial error.

■ Appellant further contends that giving the instruction that appellant had to show appellee did not perform its obligations was error because it misled the jury into addressing an issue on which there was no dispute. Appellant contends that if a contract was found to exist, appellee would automatically be in breach for stopping appellant from performing under it. We disagree. Appellant is assuming facts that are within the province of the jury to decide. The trial court did not err in giving an instruction on breach, an essential prerequisite to recovery and an issue of fact for the jury.

■ Appellant next argues that the instruction that in a written contract any ambiguity is to be resolved against the drafting party was erroneous. Appellant contends that this was misleading and directed the jury to ignore evidence that appellee's legal counsel reviewed the first engagement letter and made changes. We do not agree. The jury heard the testimony and it was its job to apply the above instruction to that evidence. The instruction did not tell the jury what to believe or prejudice the jury against appellant.

■ Appellant also finds error in an instruction that there must be an offer and acceptance. Appellant contends that this is contrary to the court's instruction on contracts implied in fact and precluded the jury from finding a contract implied in fact. Again, we disagree. Appellant cites *Legros, supra,* 44 Ohio St.3d at 6–7, 540 N.E.2d at 262–263, which states that there are three classes of

contracts: express, implied in fact and implied in law. The Supreme Court went on to state that in express contracts, assent to the terms is expressed in an offer and acceptance and in contracts implied in fact, assent is shown by the surrounding circumstances. *Id.* While the Supreme Court points out the difference between an express contract and one implied in fact with regard to assent, we do not believe that the instruction on offer and acceptance precluded the jury from finding an implied contract.

In giving the instruction on offer and acceptance, the court did not do so in the context of defining the elements of an express contract. In fact, it was in the context of defining the meeting of the minds or mutual assent element—an element necessary for any type of contract. The court stated only that in the above context, there had to be an offer and acceptance. In addition, the court gave an instruction on contracts implied in fact. Given the instructions as a whole, therefore, no prejudicial error occurred.

■ Finally, the court instructed the jury that if it determined the parties had a different understanding of whether a binding obligation for additional services could arise without a separate engagement letter, then a meeting of the minds never existed. Appellant contends that there was ample evidence that appellee had waived any requirement that a second engagement letter be signed and that the instruction contradicted the court's instruction on waiver. Again, this instruction was in the context of the meaning of "meeting of the minds" as applied to the facts. The jury also received an instruction on waiver and was free to decide the issues upon the facts presented to it. Therefore, we find no error.

Having found no prejudicial error with regard to the above jury instructions, we overrule appellant's third and seventh assignments of error.

■ In its fourth assignment of error, appellant contends that it was error for the trial court to allow evidence regarding the value of second-phase services allegedly performed by appellant and of services appellant would have performed. The admission and exclusion of evidence rest within the discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

■ Appellant argues that there was no issue as to the value of its second-phase services once it dropped its quantum meruit claim and that it was undisputed that the fee was to be one percent of the proceeds from the sale of appellee's stock. We disagree. It was undisputed in this case that there was no written, express contract. However, the central dispute in this case was whether any contract existed. While the terms of the first and second engagement letters regarding the one-percent fee could be helpful to the jury in deciding what the terms of the alleged contract implied in fact were, that was a factual issue. Certainly, the proposed fee for whatever services were rendered or were to be

rendered could have been a factor in appellee's decision whether to enter into a contract. In addition, because there was no written contract, appellee could certainly anticipate that the jury might find an implied contract, making it prudent for appellee to put on evidence regarding the value of services found to have been performed. Hence, evidence regarding the value of appellant's services was highly relevant and admissible. Therefore, appellant's fourth assignment of error is overruled.

In its fifth assignment of error, appellant argues that it was error for the trial court to refuse to admit appellant's evidence that its efforts led to a competing bid which resulted in a significant increase in the ultimate sale price of appellee's stock. Appellee had filed a motion *in limine*, which the trial court granted, seeking to preclude evidence of appellant's actions taken after May 8, 1991, which affected the sale price of PHP. At trial, appellant proffered evidence showing that on September 2, 1991, Zitsman saw a press release regarding a letter of intent between United Health Care and PHP and thought the sale price was lower than appropriate. Zitsman then contacted someone at Solomon Brothers and suggested its client, QualMed, bid on PHP. QualMed did so and as a result, United Health Care raised its bid by $5 million. Appellee argued that this evidence was irrelevant to the issues in the case—whether a contract existed and, if so, what were its terms, because appellee completely broke off its relationship with appellant on May 8, 1991, almost four months before Zitsman took the above actions. Again, the trial court's decision falls under an abuse of discretion standard. *Sage, supra.*

We find no abuse of discretion. The proffered testimony bore no relationship to any issue in the case, including the value of appellant's services. It could also have served to confuse or mislead the jury. Accordingly, appellant's fifth assignment of error is overruled.

In its sixth assignment of error, appellant argues that the trial court erred in allowing a statement during appellee's opening statement regarding an offer of compromise or settlement proposal and then failing to grant a mistrial. During its opening statement, appellee attempted to make a statement regarding appellee's vote at the May 8, 1991 meeting to compensate appellant $15,000 for services rendered between April 5 and May 8, 1991. Appellant objected, arguing it was an offer of compromise and inadmissible. The trial court allowed the following statement, saying it was not an offer of compromise or a settlement proposal:

"As I was saying, ladies and gentlemen, the evidence will show that the Academy of Medicine was not insensitive to the Harman Group and voted at the May 8th meeting to provide Mr. Zitsman, the Harman Group, with $15,000 notwithstanding that there was no contract."

Again, the trial court's action is under an abuse of discretion standard.

We hold the above statement did not constitute an offer of compromise or settlement proposal and, therefore, the trial court did not abuse its discretion in allowing it. Evid.R. 408 states, in pertinent part:

"Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. * * * This rule also does not require exclusion when the evidence is offered for another purpose * * *."

The above statement was not "evidence." There also was no "claim" at the time of appellee's vote. In addition, the statement did not indicate that the vote was an "offer" made to appellant. Indeed, appellant argued that it would be prejudiced by the statement because, for one, the evidence would show the vote was never related to appellant. For all of the above reasons, the trial court did not err in allowing, and appellant was not prejudiced by, the statement. Accordingly, appellant's sixth assignment of error is overruled.

Having overruled each of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

WHITESIDE, P.J., and BOWMAN, J., concur.